22-2254. Good morning, Mr. Kerr. Thank you, Your Honor. Chris Kerr on behalf of the defendant. I'd like to focus on three points today. The first is that the defendant's assertion that I borrowed $110,000 was not a false statement proscribed by Section 1014. The second point is that there was nothing from which a jury could infer that his statement that the funds were used for home improvements was made for the purpose of affecting the FDIC's collection activities. And the third is that even if you uphold the convictions on these two counts, the restitution order was unauthorized because the specific statements he was convicted of did not cause any loss to the FDIC, and the district court did not and could not have found that they were caused by his statements. So let's start with the false statement question. And there are two interrelated issues here. The first is, was Mr. Thompson's statement literally true? And the second is, are literally true statements penalized under Section 1014? Did we decide that question already in Freed? No, Your Honor, you did not. In the Freed case, the statements were literally false. The defendant there said that he had $7.6 million in collateral, that there was no cost to selling the collateral, and in fact, he had given away much of the assets and the collateral was double-pledged and the bank was in the second position. So his statements were... But did the opinion ever conclude that? ...misleading statements or omissions, but in fact, these statements were clearly, literally false statements. The Freed court also relied, strangely, on Justice Marshall's dissent in the Williams case, but Justice Marshall, of course, said that the impact of Williams was that you could not prosecute misleading statements or omissions under Section 1014. So Mr. Thompson's statement that I borrowed $110,000 was literally true. He did borrow that amount under a note. That was the initial amount he borrowed. Now, it was misleading because it omitted the later two advances, but misleading statements, as this court said in Krillick, are not literally false statements. There is a fundamental difference, and really, that's the government's position as well. The government said below on the motion for judgment of acquittal that the statements were literally true, but it wasn't, quote, the whole story, and they repeated that argument in the post-trial motions, and more importantly, that's really their position here. They try and retreat from their concession that the statements were literally true here, but the way they do it is with an idiosyncratic definition of literally true, which means not literally true. In other words, they equate literal truth with failure to disclose, and that is throughout their brief, including on page 34 and on page 41, when they say it was literally true, what they are saying is that there was a failure to disclose the full truth. What do we do with the Freed language, 723, going back to Freed, where the court holds that Section 1014 is roomy, there's a lot of space here, and it protects false statements or misrepresentations that mislead the institution. Your Honor, the Freed case does not even mention or does not analyze the text, which is false statements, and instead it looks at the very thing that the Bronson case tells us from the Supreme Court tells us that you're not to do. You start with the text and only move to the purpose if the text isn't clear. And Bronson tells us, and Williams both tell us, that the text, false statements here, is clear. So does Bronson overrule Freed? Well, Bronson is before Freed, and that dictum in Freed should not be followed. So it's dictum. I think it is dictum, Judge. And this court in the Standforth case clearly held that Section 1014 only covers literally false statements. In that case, the statement was to a bank, you have collateral, but it was misleading because the collateral wasn't worth anything. And this court reversed the conviction because it was a literally true statement. Even if your distinction between borrowed and owed makes a difference, just assume for purposes of this question, why wouldn't his statement that he only borrowed $110,000 be literally false? It would have been if he'd made it, but he never said that. The transcript is absolutely clear, and in their brief, the government puts in parentheses the word only. If he said, I only borrowed $110,000, he's guilty. He didn't say it, nobody says he said it, and there's not a scrap of evidence that he said it. So, Your Honors, I now would like to move to the statement about home improvement, and the question there is slightly different. We don't dispute that that statement was false. He did not use the funds for home improvement, but there's a separate element here, and that is the subjective intent element of having the purpose to influence the FDIC. And both the Supreme Court in the Wells case and this court on Bonk in the Phillips case have made clear that because this subjective intent is difficult to prove, normally, almost always, we have to look at the natural tendency of what was said. If we affirm on the statement about what he borrowed, do you agree that any error with respect to the home improvement statement would be harmless, given the way it was charged in the special verdict form? I'm not sure that harmless error is the right point, but because there were two separate false statements, the conviction could be upheld even if the home improvement statement was incorrect, you know, if the verdict was incorrect on the home improvement statement. But to take us back to Wells and Phillips, the question is the natural tendency of what he said, and saying the funds were borrowed for home improvement just had and could have had no effect on the FDIC's collection activities. The FDIC doesn't care what you borrowed the money from. It's not like when you borrow money from a bank, if you say I'm going to use it for drug dealing, the bank's not going to loan you the money, and it has the natural tendency to affect the bank to lie about why you're borrowing money. But this is a collection activity, and the question is how could it possibly have the tendency to affect the FDIC to say you borrowed it from home improvements when you borrowed it to make a contribution to your law firm? And the answer that the government gives is utterly unsatisfying. It's a series of conjectures, one on top of the other, that's very hard to even follow. But let me emphasize one point in particular. It's based on a totally false premise, and the premise is that Mr. Thompson said this because he believed that the bank didn't have records showing the full amount he owed. I will tell the court they proved to a fairly well in the district court that he did know that. They had eight separate documents which he received from the bank which showed the full amount he had borrowed, and they're all listed in the government's brief in this case. So the government, for the purposes of false statements, says he absolutely had records from the bank showing that he knew the total amount, but they say for the purpose of his intent that somehow he thought the bank didn't know what he owed. That's just incorrect. There's also a conclusion that simply doesn't follow. It's a non sequitur. The conclusion of the government's argument is that he said it because it would, quote, look weird if a note that references property was used for something else. Well, that's just wrong, right, because when you borrow money from a bank, you can borrow it against a home to buy a home or to pay for college or to go on vacations. There's nothing about the fact, even if it had been a mortgage note, which it is not, there's nothing about the fact that it was referenced a home that would lead you to believe that it was for home improvement. The final point I would like to make is with regard to the restitution, and I don't even think this is a close point. The statute, and these legal points are undisputed. The specific conduct of which he was convicted, those two specific false statements, must be the cause of the loss. And it's also undisputed that that means direct, that is, but-for causation and proximate causation. Do you mind if I jump in before we talk about the restitution? Yes, you're up. There's just a follow-up. If we disagree with you on Freed as far as whether or not that was dictum, and we conclude that misleading statements can be false statements, is there any way that we can agree with you that the trial evidence constructively amended the indictment? Yes, you can. Whether or not the statement, even if the statements were criminal, there are two problems that relate-related problems that show a constructive amendment of the indictment. One is the conflation of the terms borrowed and owed. He was-he was indicted for saying that he owed only $110,000 and nothing more, and- Why is that not a variance? It's not a variance because it's material. The cases-your cases make clear that what-the difference between a material variance and an immaterial variance is that it's immaterial when the two things are synonymous. It's-in the Sorge case, it was synonymous to say, I haven't heard of something and I don't know of something. Those are synonyms. In the Onanga case, it was synonymous. The charge was something like there was no bona fide marriage, and the statement was that it's not a legal marriage. Well, legal means bona fide. These are synonyms. Borrowed and owed are not synonyms, and the FDIC representatives and the agent admitted that at trial. The other thing is it's not synonymous to say, I don't-I did borrow $269,000 and I only owe $110,000. Those are-that's a logical disconnect. Any amount-by saying I didn't borrow $269,000, any amount less than that could have been the amount he borrowed without implying that he only borrowed $110,000. Would you maintain looking at the restitution that Thomas' false statements or misleading statements caused a loss of $219,000? They definitely did not cause a-first of all, they paid the $219,000. The loss was the interest of $50,000, and they definitely did not, and the court didn't find they did. The court, instead of applying a causation standard, said that the loss was, quote, encompassed within the circumstances of the offense. To determine but-for causation, we look at the counterfactual world. The counterfactual world here is if Mr. Thompson had said nothing at all about the-what he owed to the FDIC. If he'd said nothing at all, the loss still would have occurred for two reasons. The FDIC knew at all times how much he owed. There was not a shred of thought or proof that somehow he misled them. They knew what he owed at all times. The witnesses said that. Number two, Mr. Thompson-the decision to settle with Mr. Thompson by the FDIC was explicitly, and the government admits this, because the note was ill-documented. It had nothing to do with what he said. If it wasn't-if there wasn't a direct and proximate cause between his specific statements and the loss, their restitution is not authorized under the statute. The court simply applied the wrong standard. Thank you very much. Thank you, Mr. Kerr. Ms. Peterson.  Good morning. May it please the court. At trial, there was no dispute about what the defendant said to Planet Home Lending, the loan servicer, after he received an invoice for approximately $269,000. It's on tape. Instead, at trial, the parties disputed the meaning of the words the defendant said. The jury, whose job it was to decipher that meaning, determined defendant made false statements when talking to Planet Home Lending, that he-when he said he borrowed $110,000, and he was surprised by the higher amounts. Ms. Peterson, how do we get around Braunston? It concluded that the federal perjury statute does not criminalize literally true statements, even if they're misleading. Well, Your Honor, I have a couple responses to that. First of all, Braunston is in the perjury context. Neither the Supreme Court nor this court has ever extended the Braunston analysis to a Section 1014 charge. Section 1014 arises in a very sort of different setting than classic perjury. And the Braunston court had two main concerns when talking about-when thinking about misleading statements in the perjury context. The first main concern was that in the perjury context, if a witness gives an answer that's misleading or confusing, it's up to the questioner to follow up, to drill down on what it is that the witness meant and to seek clarification. That's not happening in a Section 1014 setting. A Section 1014 setting is much more casual. It's a person communicating with the bank, making statements to the bank, giving the bank documents. This idea of-this notion that a witness can be brought back on track with better questioning isn't happening in a Section 1014. The other concern that existed for Braunston in the perjury context, which doesn't exist here, was an overall concern about the chilling effect on witnesses testifying. The Supreme Court didn't want witnesses to be overly worried about the preciseness of their answers or getting trapped up with a confusing question, that it would chill sort of our court proceedings if witnesses were doing that. And again, there's not that concern with a Section 1014. There's not a concern that people won't go to banks or won't seek loans because they're worried that they might get sort of tripped up in a false statement. So Braunston is just not applicable in the Section 1014 context. And this court has not-and the Supreme Court has not held that it is. During this conversation-and my second response is that the defendant's statements are just not literally true. They're not literally true. Is there a distinction between the borrow and the owe? There can be a distinction between borrow and an owe, but in the cases-even cases that talk about literal truth, those cases also say that you look to the context, to what the party is trying to convey, to the meanings that the party's attached to what's being said. And in this case, what the defendant is trying to convey is that he only owes $110,000. And he conveys that by receiving an invoice in the mail with a higher amount, calling plan at home lending and saying, I have no idea where this number came from. It doesn't match anything I have. I'm shocked. I'm perplexed. Significantly higher than any number I've seen. I borrowed $110,000. I'll pay what I owe, but I borrowed $110,000. And in this case, what defendant is conveying is that the amount that he borrowed is the amount that he owed. This much smaller amount, that's not true. He had received loan distributions of over $200,000. Do you agree that he never said, I only borrowed $110,000? He never uses those words, but those words are not charged in quotation marks. He conveyed it in substance. He conveyed it in substance by repeatedly talking about this $100,000 or $110,000 number. And he conveyed the only part in substance by saying things like, I don't know where this number on my invoice came from. It's significantly higher. It's much more than any number I've ever seen before. That's how he's conveying the only. So in substance, certainly the jury was entitled to conclude that in substance, what he is saying is, I only owe this amount. And he does talk about what he owes. And he says, I'll pay what I owe, but I borrowed $110,000. So he's sort of linking them together in the same thought. Ms. Peterson? Yes. In that phone call where he disputes the $269,000. Yes. Is there anything in the call where he denies that he owes something more than $110,000? He denies it by talking about. Well, I understand that he wants to focus on the $110,000. And I understand your argument that that, in effect, says that's all I owe. But we don't have anything where he says. He calls it dispute. He disputes it. He does not deny the potential, does he? For liability beyond $110,000? He says $110,000 repeatedly, $100,000 or $110,000. He says it four or five times over the course of the call. And I think the jury is entitled to conclude that the substance of what he's saying is, I do only owe that amount. Does he say, I only owe this amount, precise, in those exact quotes? He does not. But he doesn't have to for the jury to determine that that's what he meant when he's making these representations on the call. So the jury's finding it. I wasn't clear beyond the phone call. There's the email from the president of the bank. Is that also submitted at the trial as well? Yes. If the court's referring to, the defendant received an email from the bank's president in, I think, approximately 2014. May of 2014. Giving him a loan amount of approximately $230,000 at that point. Yes, that came into evidence at trial. And I don't have the citation on me, but it's in the brief. And it was part of what the record was supplemented with, Your Honor. District Court 205-2 is the citation. Thank you. So the jury's finding on count one is supported by the evidence. And the jury's finding on count two is equally well supported. The defendant repeats essentially the same or a subset of the same statements when he has a phone call with the FDIC directly shortly after the first phone call that's charged in count one. I want to talk about literal truth doctrine. We started talking about it with Braunston. And, again, our position is that the defendant's statements are not literally true. They're not literally true because the point he is trying to make, what he is conveying, is false. And that's consistent with this court's rulings in Swanquist and in Freed. I think that we are squarely on all fours with what happened in Freed. In Freed, the court affirmed a 1014 conviction after a defendant listed collateral notes, potential collateral, when they were pledged elsewhere, implying that they were more available than they were. And this court found that that wasn't a false statement under 1014. And that's very similar to what's happening here. Similarly, in Swanquist, a defendant listed some but not all of his outstanding debts on a loan application or on a financial statement, and that was found to be sufficient for a 1014 conviction in our court's case law. And so we need to look at what the defendant is trying to convey. And here, what he was conveying was not literally true. That was our position in the district court. That was our position in response to the motion. Ms. Peterson, what does the response by Planned Home that they would look into the problem when he makes the representation of about $110,000 and he doesn't understand the $269,000? Speaking again to context, why would they say, well, we'll look into the problem? Was it a suggestion that there's flexibility in this discussion about the ultimate loss? He calls the 1-800 number that's on the invoice he receives, and the customer service rep he talks to doesn't know anything about the loan. He's a person who answers the phone, and so his job is to say, okay, well, I'll write it down and I'll pass it along to somebody who can answer the question for you. So I don't think there's much that can be drawn from that. Planned Home, at that point, that listener didn't know anything about the loan. He was simply taking the information from the defendant to pass along to someone else to look into the loan. So your position is that that's all it is, is a reporting of his position, but not giving anything to the suggestion there might be something more than $110,000, even though he disputes $269,000. I apologize because I'm not precisely tracking your question. He's having the conversation where he says, gee, basically, I don't know where you're getting this $269,000. Correct. I borrowed $110,000. Correct. He doesn't announce that he's got other liability. Correct. And the response from the other side is, well, we'll look into it. Does that leave it open-ended? I understand you can draw the conclusion that he's trying to limit it to just $110,000, but it leaves me with a little pause about this, that we're going to continue the conversation potentially by reporting back that you think it's not $269,000. I guess that's my inquiry because you're asking us to draw and you suggest the jury legitimately can that he's just saying it's $110,000, it's nothing else. And I'm just a little bit of concern about whether the we'll look into it leaves open a question of how definite, misleading a statement he is making. I think there's other parts of the call to look at, Your Honor. The defendant says things like, I want to resolve this quickly. Can we get it resolved in a week? I don't know what you have in your loan file, but I know I only signed one note, and that note was for $110,000. So the defendant is conveying and trying to convey, hey, there's only one thing out there. It's this note, and it's only for $110,000, and that's what I want us to focus on. So he is sort of pushing the conversation, and that gets me to the lie about home improvement. Why did he mention the promissory note in your opinion? I think he mentioned the promissory note in my opinion because he knew that it was only for $110,000, and he only wanted to pay $110,000. So he's directing the plan at home lending and the FDIC to go find that note, find that that's the amount on it, and make him only pay that amount without doing any additional digging or work to find these other loan distributions because the defendant says during the call, there was no closing. I only signed one note. He knows he didn't sign any additional paperwork for the other loan advances that he had received, so he's hoping that no one will go look and find them, and that's also why he makes the lie about home improvement. He knows what the note looks like. He knows that there's only one note. He knows that his contact at the bank has committed suicide. How could his statement about home improvement, though, have impacted the FDI in its collection efforts? When you look at his point of both those phone calls, it's to resolve it quickly for them to find the note and for him to pay the amount that's on the note. So he doesn't want them to do any additional inquiries or searching. I understand that, but how does the statement about he used it for home improvement impact the FDIC's actions in collecting on the debt? He just has to intend it to influence. It doesn't actually have to. How could that statement about home improvement have satisfied that intent element on his part? He is trying to convey that the loan is consistent with and only with what was on the note. But that doesn't matter in terms of collection, does it? They just want their money back. They want their money back, but at that point, they hadn't even found the other distribution checks yet. He's hoping to convince them to look at the note and not look any further, and that's why he's making these reference citations about home improvement, because he knows the note talks about a security interest in property and restrictions on selling the property. So he wants to make it appear that the loan happened consistent with the note and nothing else happened. But at that point, they just want their money back. Correct. They just want their money back. Regardless of what he used it for. Correct, but they are also trying to figure out what is the amount of money he even owes, and he knows he only signed one note, and it's this note with references to property. Really quickly, I want to go to the constructive amendment issue. There is no constructive amendment here. The jury was instructed exactly what the false statement was that was charged. Defendant's argument that the evidence constructively amended is really just an argument about the sufficiency of the evidence. If the evidence is, and that's what Willoughby says, if the evidence was sufficient to support the false statement as charged, there's not a constructive amendment. At most, it's a variance that is harmless. I see that I am out of time, so if there are no further questions, I respectfully request his convictions be affirmed on count one and two and his restitution order be confirmed. Thank you, Ms. Peterson. Mr. Gehr, I know your time was almost up, but we'll give you two minutes. Thank you so much, Shirley. There are a couple of points that I'd like to make, and I'd like to start with Judge Flom's question about the phone call with Planet Home Lending, because there was no definite statement there. In fact, Mr. Thompson said, and this is on the tape, in the transcript, two or three different times, I don't know where this came from, but I'd like to see what documentation that you have. I'll walk through the documentation with you. I'll walk through the documentation with you or with the FDIC. I was expecting to sit down with the FDIC, and so Mr. Thompson was clearly not making a definite statement there. He was saying what he believed at the time, and he was asking for guidance and suggesting that he'd like to see the documentation. So that's a part of the conversation that I think that my learned opponent forgot to mention. Secondly, on Bronson and on the question of the perjury statute, one of the key elements of Bronson, the first thing the Supreme Court says in Bronson is there is a serious literal textual problem with the government's argument that perjury includes misleading statements. The Supreme Court in Bronson did talk about the context of perjury and why perjury is especially problematic because of the context, but that only came in response to the government's argument that you had to look beyond the text to interpret the statute. And we now know that it's really clear from the Supreme Court to this court that if the text is clear and unambiguous, which it is here, false statement, there's no point and there's no right to look beyond the text of the statute. Thank you, Mr. Garrett. Thank you very much. We'll take the case under advisement.